1  DANIEL J. O'HANLON, State Bar No. 122380
   ELIZABETH LEEPER, State Bar No. 280451
2  REBECCA R. AKROYD, State Bar No. 267305
   KRONICK, MOSKOVITZ, TIEDEMANN & GIRARD
3  A Professional Corporation
   400 Capitol Mall, 27th Floor
4  Sacramento, California 95814
   Telephone: (916) 321-4500
5  Facsimile: (916) 321-4555

6  Attorneys for Plaintiffs, SAN LUIS & DELTA-
   MENDOTA WATER AUTHORITY and
7  WESTLANDS WATER DISTRICT

8  JON D. RUBIN, State Bar No. 196944
   General Counsel
9  SAN LUIS & DELTA-MENDOTA WATER AUTHORITY
   400 Capitol Mall, 28th Floor
10 Sacramento, CA 95814
   Telephone: (916) 321-4519
11 Facsimile: (209) 826-9698

12 Attorneys for Plaintiff, SAN LUIS & DELTA-
   MENDOTA WATER AUTHORITY

13

14 *Additional Counsel on Next Page*

15                **UNITED STATES DISTRICT COURT**

16                **EASTERN DISTRICT OF CALIFORNIA**

17

18 SAN LUIS & DELTA-MENDOTA WATER          Case No.
   AUTHORITY and WESTLANDS WATER
19 DISTRICT,                                **COMPLAINT FOR VIOLATIONS OF
                                            THE NATIONAL ENVIRONMENTAL
20            Plaintiffs,                    POLICY ACT**
                                            (42 U.S.C. §§ 4321 *et seq.*)
21        v.

22 SALLY JEWELL, as Secretary of the U.S.
   Department of the Interior; U.S.
23 DEPARTMENT OF THE INTERIOR; U.S.
   BUREAU OF RECLAMATION; and DAVID
24 MURILLO, as Regional Director, Mid-Pacific
   Region, Bureau of Reclamation, U.S.
25 Department of the Interior,

26            Defendants.

27

28

1469894.3  10355-069

1

**ADDITIONAL COUNSEL**

2  PHILIP A. WILLIAMS, State Bar No. 296683
   Deputy General Counsel
3  WESTLANDS WATER DISTRICT
   400 Capitol Mall, 28th Floor
4  Sacramento, CA 95814
   Telephone: (916) 321-4525
5  Facsimile: (559) 241-6277

6  Attorneys for Plaintiff, WESTLANDS WATER DISTRICT

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT

1      Plaintiff San Luis & Delta-Mendota Water Authority ("Authority") and Plaintiff Westlands

2  Water District ("Westlands"), (collectively, "Plaintiffs"), allege as follows:

3  **I.      JURISDICTION**

4      1.      This is a civil action brought against the United States that arises under the

5  National Environmental Policy Act of 1969, as amended ("NEPA"), 42 U.S.C. section 4321 et

6  seq.  This Court has jurisdiction of this action pursuant to 28 U.S.C. section 1346(a)(2) and 28

7  U.S.C. section 1331.  This Court is authorized to issue a declaratory judgment and further relief

8  under 28 U.S.C. sections 2201 and 2202.

9      2.      The sovereign immunity of the United States, and that of its federal agencies and

10  federal officers and employees, is waived for this action by the judicial review provisions of the

11  Administrative Procedure Act, 5 U.S.C. section 701 et seq., including sections 702 and 704.

12  **II.     INTRODUCTION**

13      3.      This case is brought to compel the United States Bureau of Reclamation

14  ("Reclamation") to do what this Court and the United States Court of Appeals for the Ninth

15  Circuit previously directed it to do – to fulfill its obligations under NEPA.

16      4.      This case challenges Reclamation's disregard of its obligation under NEPA to take

17  a hard look at the effects on the human environment of modifying operations of the Central Valley

18  Project ("CVP"), in coordination with the  State Water Project ("SWP") (herein after "coordinated

19  CVP operations").

20      5.      Through this case, Plaintiffs seek an order compelling Reclamation to analyze,

21  disclose, and try to mitigate, the environmental effects of coordinated CVP operations consistent

22  with biological opinions (individually referenced herein as "BiOp" or collectively referenced

23  herein as "BiOps") issued by the National Marine Fisheries Service ("NMFS") in 2009 and United

24  States Fish and Wildlife Service ("FWS") in 2008.

25      6.      For years, the farms, families, cities and wildlife that depend upon CVP and SWP

26  water supplies have suffered the environmental and socioeconomic impacts of the reduced water

27  deliveries that result from the BiOps.  In 2008 and 2009, Reclamation accepted the BiOps without

28  first considering their impacts on the human environment, as required by NEPA.

7.      In 2014, in addressing Reclamation's failure to perform any NEPA analysis prior to implementing the 2008 BiOp, the Ninth Circuit, affirming this Court's ruling on NEPA grounds, explained:

> [I]t is beyond dispute that Reclamation's implementation of the BiOp has important effects on human interaction with the natural environment.  We know that millions of people and vast areas of some of America's most productive farmland will be impacted by Reclamation's actions.  Those impacts were not the focus of the BiOp….  We recognize that the preparation of an EIS [Environmental Impact Statement] will not alter Reclamation's obligations under the ESA.  But the EIS may well inform Reclamation of the overall costs — including the human costs — of furthering the ESA.

8.      After being told by this Court and the Ninth Circuit that it violated federal law, Reclamation should have utilized the NEPA process to critically examine the impacts of the BiOps and evaluate mitigation measures and alternatives that could minimize or avoid water supply impacts.  Reclamation did not do so.

9.      Reclamation spent more than three years preparing an environmental impact statement for the Coordinated Long-term Operation of the Central Valley Project and State Water Project ("EIS").  However, the EIS is blatantly inadequate, and Reclamation has once again failed to comply with NEPA.

10.      Reclamation failed to use the opportunity NEPA provided to help inform decisions regarding coordinated CVP operations.  Reclamation neglected this important opportunity to consider if and how the BiOps were furthering the federal Endangered Species Act ("ESA"), whether there were alternatives to the BiOps that might better achieve the purposes of the ESA, and whether Reclamation could implement coordinated CVP operations consistent with the ESA and also avoid or minimize the BiOps "important" impacts on the "millions of people and vast areas of some of America's most productive farmland."

11.      Reclamation still has not complied with NEPA, and once again, litigation is necessary to hold Reclamation responsible for its obligations under federal law.  The EIS did not fully or adequately consider the environmental impacts of modified coordinated CVP operations, and fails to follow NEPA's procedures and requirements for identifying and evaluating mitigation measures and action alternatives.  Rather than perform NEPA analyses that examined ways to

minimize or avoid the evident and experienced impacts of reduced CVP water deliveries, Reclamation's EIS was an exercise in rubber-stamping its earlier decision to change CVP operations as specified in the BiOps.

12.    Environmental impact statements provide a means of assessing the environmental impacts of proposed agency actions, rather than justifying decisions already made.  40 C.F.R. § 1502.2(g).  The EIS fails this essential function.

13.    Instead of presenting a true no action alternative, the EIS used a No Action Alternative that includes the changes to coordinated CVP operations prescribed by the BiOps. Thus, the EIS assumed, as a given, implementation of the agency action it was supposed to be analyzing.  This error in approach permeates the EIS and renders it fundamentally flawed.

14.    The EIS masks and thus fails to disclose the water supply impacts of the BiOps, by unreasonably assuming that reductions in surface supply caused by the BiOps would be entirely offset by increased future groundwater use.  Despite extensive land fallowing that has resulted from implementation of the BiOps, and a new regulatory regime in California that will govern groundwater use, the EIS unreasonably assumes that increased use of groundwater will make up for the CVP and SWP water supply deficits that will result from the BiOps.

15.    As a result of its unreasonable assumptions about groundwater use, the EIS proceeds to unreasonably conclude that the BiOps will not cause significant impacts in agricultural and urban areas, or significant socioeconomic impacts to communities in California, or cause significant environmental justice impacts in those communities.

16.    This assumption and the conclusions reached in the EIS defy the reality of the actual, observed impacts of implementing the prescriptions of the BiOps; groundwater cannot fully compensate for the massive loss of CVP and SWP surface supply caused by following the BiOps.

17.    By ignoring the reality of actual, observed impacts of implementing the prescriptions of the BiOps, the EIS ignores significant impacts to agricultural and urban areas and to wildlife refuges.

18.    The EIS fails to acknowledge or incorporate into its analysis the known impacts of

3

the BiOps.  The EIS ignores the real-word impacts realized over the past 7-8 years, from the time Reclamation accepted the BiOps to the time it completed the EIS.

19.     The EIS fails to tackle the essential problem facing Reclamation – how to meet its obligations under the ESA while best serving the multiple purposes of the CVP.  The EIS fails to even ask whether the particular prescriptions of the BiOps are actually necessary for Reclamation to comply with its obligations under the ESA or effective for protecting endangered fish populations, and hence fails to consider whether alternative CVP operations could better meet the CVP's water supply purposes while still meeting Reclamation's ESA obligations.

20.     As a result of the inadequacies described above, Reclamation's approach to the EIS fails the species the BiOps are intended to protect.  It fails the millions of people and millions of acres of highly productive agricultural land reliant upon the CVP and SWP for water.  It fails the tens of thousands of acres of prime wetlands that serve the waterfowl in wildlife refuges. Ultimately, Reclamation's approach to the EIS fails to comply with the intent of this Court's and the Ninth Circuit's prior orders and with the requirements of NEPA.

21.     The EIS does not identify *any* mitigation for the impacts from loss of CVP and SWP surface water deliveries from implementation of the BiOps, a loss the EIS estimates will average over 1 million acre-feet a year.  The failure to identify any mitigation is particularly egregious given the significant impact the BiOps have caused to the human environment between 2008/2009 (when the BiOps were issued) and 2016 (when the EIS was completed).

22.     In sum, NEPA requires much more than the EIS provides.  NEPA prohibits Reclamation from continuing to subject the people of California to the water supply and related impacts of changing coordinated CVP operations pursuant to the BiOps without making a good faith effort to disclose the environmental and socioeconomic impacts of those changes, and identifying mitigation measures and alternatives that could minimize the environmental impacts of complying with the ESA.

23.     Plaintiffs ask this Court to, once again, order Reclamation to fulfill its legal obligations under NEPA, so that decision-makers and the public can receive the benefits NEPA provides for – a "full and fair discussion of significant environmental impacts" that informs

1  "decisionmakers and the public of the reasonable alternatives which would avoid or minimize

2  adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

3      24.    Plaintiffs ask this Court to declare the EIS legally inadequate and to set aside the

4  "Record of Decision for the Coordinated Long-Term Operation of the Central Valley Project and

5  State Water Project" ("Record of Decision") as unlawful, and to order Reclamation to prepare a

6  new environmental impact statement in conformance with its rulings.

7  **III.   PARTIES**

8      25.    Defendant Sally Jewell is the Secretary of the United States Department of the

9  Interior ("Secretary"), and is named herein in her official capacity.

10     26.    Defendant United States Department of the Interior ("Interior") is a department

11 within the Executive Branch of the United States government.

12     27.    Defendant Reclamation is an agency of the United States, within the Department of

13 the Interior.  Reclamation is charged with various duties and responsibilities including operating

14 the CVP and entering into and administering contracts for CVP water on behalf of the United

15 States of America.

16     28.    Defendant David Murillo is the Regional Director of Reclamation's Mid-Pacific

17 Region ("Regional Director"), and is named herein in his official capacity.  The Regional Director

18 is responsible for the administration and operation of the CVP.

19     29.    Plaintiff Authority is a joint powers authority formed pursuant to California

20 Government Code section 6500 et seq.  The Authority consists of 28 member public agencies, 26

21 of which contract with Reclamation for water supply from the CVP.  Water delivered to the

22 Authority's members by the CVP is used within areas of San Joaquin, Stanislaus, Merced, Fresno,

23 Kings, San Benito, and Santa Clara Counties, California.  Among the purposes for which the

24 Authority was formed is to preserve and protect the quantity and quality of surface and

25 groundwater supplies available for use within the boundaries of its member agencies.  The

26 Authority is authorized under its formation agreement to commence and maintain suits on behalf

27 of its member agencies.

28     30.    Plaintiff Westlands is a California water district formed pursuant to California

1   Water Code section 34000, et seq.  Westlands is a member agency of the Authority.  Westlands

2   provides water to an area of approximately 600,000 acres in Fresno and Kings counties on the

3   western side of the San Joaquin Valley of California.  Westlands holds vested contractual rights to

4   receive CVP water from the United States Bureau of Reclamation for distribution and use within

5   Fresno and Kings Counties.  Westlands also holds vested contractual rights to receive additional

6   CVP water under the Stipulated Judgment entered on December 30, 1986, in the consolidated

7   cases of *Barcellos and Wolfsen, Inc., et al. v. Westlands Water District* and *Westlands Water*

8   *District v. United States of America*, Nos. CV 79-106 OWW and CV F-89-245 OWW (E.D. Cal.).

9   Most of Westlands' CVP water is supplied via CVP pumps and facilities located within the San

10  Francisco Bay-Sacramento/San Joaquin River Delta ("Delta"), but some of Westlands' CVP water

11  can also be supplied via SWP pumps and facilities located within the Delta.  Westlands is

12  authorized to commence and maintain on behalf of landowners within its boundaries any action

13  involving or affecting the ownership or use of water.

14      31.     This action is germane to the purposes of the Authority and Westlands.

15      32.     Changes to CVP operations pursuant to the BiOps have resulted in cascading

16  environmental impacts within the service area of Westlands and other Authority member districts.

17  These cascading environmental impacts include but are not limited to: impacts to groundwater

18  resources, including groundwater overdraft and impacts to groundwater quality; impacts to

19  agricultural resources, including land fallowing and reduced crop yields; socioeconomic impacts

20  to agriculture-dependent communities, including reductions in agricultural production and losses

21  in agricultural jobs and related industries;  environmental justice impacts in agriculture-dependent

22  communities that have high levels of poverty and minority populations; impacts to wildlife within

23  wildlife refuges; and impacts within urban areas that depend upon CVP water supplies.

24      33.     Here, the NEPA process was intended to inform Reclamation's decision-making

25  regarding coordinated CVP operations.  Reclamation's failure to comply with NEPA in evaluating

26  the environmental consequences of modifying coordinated CVP operations, either under the

27  BiOps or alternative actions, results in environmental and procedural injuries that harm the

28  Authority's member agencies and that harm landowners within Westlands.

6
COMPLAINT FOR VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT

34.     Reclamation's failure to identify mitigation for, or alternatives to, the prescriptions in the BiOps harms the Authority's member agencies, including Westlands, and landowners within Westlands, because mitigation or alternatives identified in a lawful environmental impact statement could reduce the CVP water supply impacts from Reclamation's compliance with the ESA.

**IV.     VENUE**

35.     The Eastern District of California is the proper venue for this case under 28 U.S.C. sections 1391 (b)(2), 1391(e), and 1402 because: (1) it is the district in which a substantial part of the events or omissions giving rise to the claim occurred; and (2) the Authority's principal place of business is located within Merced County and Westlands' principal place of business is located within Fresno County.

**V.     SUMMARY OF FACTS GIVING RISE TO CLAIMS**

**Operations of the Central Valley Project and the State Water Project**

36.     The CVP and SWP operate within California's Central Valley.  The Central Valley, and specifically the Delta, is one of the most highly modified and controlled systems in the world. Approximately over the last 150 years, more than 95 percent of the original wetlands, floodplains, and riparian habitats have been destroyed.  Channels have been widened, straightened, deepened, connected, and regulated with levees and gates.  Rivers tributary to the Delta have been dammed and flows manipulated.  Hydraulic mining has had lasting effects on sediment dynamics.  Non-native species have been introduced and have become well established.  The human population has grown considerably with resultant land use changes, increases in demand for water, and increases in pollutant loads in waterways.  The climate has changed and is changing, sea level is rising, and ocean conditions have fluctuated.

37.     The CVP is the largest water storage and delivery system in California, covering 29 of the state's 59 counties.  The CVP consists of 21 reservoirs capable of storing 12 million acre-feet ("AF") of water, 11 power plants, 500 miles of major canals, aqueducts and tunnels.  The CVP provides water to irrigate approximately 3.25 million acres of farmland and supplies water to more than 2 million people through more than 250 long-term water contracts in the CVP service

1    area. CVP water serves agriculture, municipal and industrial uses, power generation, fish and

2    wildlife, and other beneficial uses.

3         38.    Most of the CVP service area is within the Central Valley of California. CVP

4    water serves critical needs of those in agricultural and urban areas, as well as the largest

5    contiguous wildlife refuges in the western United States.

6         39.    The CVP and the SWP have been operated pursuant to a series of cooperative

7    operating agreements between Reclamation and the California Department of Water Resources

8    ("DWR"). The SWP is the largest state-operated water supply project in the United States. The

9    SWP supplies municipal and industrial and agricultural water in the San Francisco Bay Area, the

10   San Joaquin Valley, the Central Coast, and Southern California.

11        40.    The Delta is used to convey CVP and SWP water from the wetter northern regions

12   of California to the Authority's member agencies, including Westlands, and SWP water

13   contractors located in the drier central and southern regions. The Authority's member agencies,

14   including Westlands, and SWP contractors in turn distribute the water to water users in their

15   service areas.

16        41.    Reclamation's operation of the CVP is subject numerous laws, including the ESA.

17   Reclamation has engaged in ESA consultations with FWS and NMFS under section 7 of the ESA

18   (16 U.S.C. § 1536) regarding the coordinated long-term operation of the CVP and SWP with

19   respect to certain species listed under the ESA and their critical habitat.

20        42.    In August 2008, Reclamation and DWR submitted a biological assessment to FWS

21   and NMFS to initiate formal consultation under the ESA regarding coordinated long-term

22   operation of the CVP and SWP.

23   **The 2008 Biological Opinion Regarding Project Operations & the Resulting Litigation**

24        43.    On December 15, 2008, FWS issued a biological opinion ("2008 BiOp")

25   purportedly addressing the impact of coordinated operations of the CVP and SWP on the

26   threatened delta smelt, prepared pursuant to Section 7(a)(2) of the ESA, 16 U.S.C. section

27   1536(a)(2).

28        44.    The 2008 BiOp concluded that the proposed coordinated operations of the CVP and

COMPLAINT FOR VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT

1  SWP were likely to jeopardize the continued existence of the delta smelt and adversely modify

2  delta smelt critical habitat.   The 2008 BiOp included a Reasonable and Prudent Alternative

3  ("RPA") designed to allow the CVP and SWP to continue operating without causing jeopardy or

4  adverse modification.   The 2008 BiOp includes various operating prescriptions on the CVP and

5  SWP.

6  　　　　45.   Reclamation provisionally accepted and then implemented the prescriptions of the

7  2008 BiOp, including the RPA.   Reclamation did not prepare any NEPA documentation in

8  connection with its decision to implement the changes to coordinated CVP operations prescribed

9  by the 2008 BiOp.

10  　　　　46.   The Authority and Westlands filed a lawsuit challenging Reclamation's failure to

11  comply with NEPA prior to its decision to implement the changes to coordinated CVP operations

12  prescribed by the 2008 BiOp.   This Court concluded that Reclamation's provisional acceptance

13  and implementation of the 2008 BiOp and its RPA constituted major federal action because they

14  represented a significant change to the operational status quo of the CVP and SWP.   *San Luis &*

15  *Delta-Mendota Water Auth. v. Salazar*, 686 F. Supp. 2d 1026, 1044-1049 (E.D. Cal. 2009)

16  ("*Salazar*").

17  　　　　47.   This Court found that the potential environmental impact of groundwater overdraft

18  resulting from the 2008 BiOp was beyond reasonable dispute and that this potential impact alone

19  raised the kind of serious questions about whether a project may cause significant degradation of

20  the human environment, requiring NEPA compliance.

21  　　　　48.   This Court concluded that the Authority and Westlands were entitled to summary

22  judgment on their claim against Reclamation and the Secretary of Interior that Reclamation

23  violated NEPA by failing to perform any NEPA analysis prior to provisionally adopting and

24  implementing the 2008 BiOp and its RPA.   *Salazar*, 686 F. Supp. 2d at 1051.

25  　　　　49.   On appeal, the Ninth Circuit affirmed this Court's judgment with respect to the

26  NEPA claims.   The Ninth Circuit held that Reclamation's provisional adoption and

27  implementation of the 2008 BiOp triggered its obligation to comply with NEPA.   *San Luis &*

28  *Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 642 (9th Cir. 2014).   The Ninth Circuit

affirmed the district court's order remanding to Reclamation so that Reclamation could perform NEPA review evaluating the effects of its adoption and implementation of the 2008 BiOp. *Id.*

50.    After the appeal, this Court entered an amended judgment that remanded without vacatur Reclamation's provisional acceptance of the 2008 BiOp and its RPA. This Court ordered Reclamation to comply with its obligations under NEPA.

**The 2009 Biological Opinion Regarding Project Operations & the Resulting Litigation**

51.    On June 4, 2009, NMFS issued of a biological opinion finding that the coordinated operations of the CVP and SWP were likely to jeopardize the continued existence and adversely affect the critical habitat of certain salmonid and other ESA-listed species ("2009 BiOp"). In the 2009 BiOp, NMFS proposed a RPA that included a number of operating restrictions and other measures on the CVP and SWP.

52.    Reclamation accepted and then implemented the prescriptions of the 2009 BiOp, including the RPA. Reclamation did not prepare any NEPA documentation in connection with its decision to implement the changes to coordinated CVP operations prescribed by the 2009 BiOp.

53.    The Authority and Westlands filed a lawsuit challenging Reclamation's failure to comply with NEPA prior to its decision to implement the changes to coordinated CVP operations prescribed by the 2009 BiOp. This Court concluded that "Reclamation's operation of the projects to comply with the 2009 Salmonid BiOp RPAs is major federal action under NEPA." *Consol. Salmonid Cases*, 688 F. Supp. 2d 1013, 1024 (E.D. Cal. 2010). This Court concluded that implementation of the 2009 BiOp and its RPA constituted a non-trivial revision of procedures or standards for the operation of the CVP and SWP "with draconian consequences" that triggered NEPA. *Id.* at 1032.

54.    This Court found that the 2009 BiOp would "materially reduce water exports" and concluded that it was beyond dispute that such reductions have the potential to significantly affect the human environment. *Consol. Salmonid Cases*, 688 F. Supp. 2d at 1034.

55.    This Court ruled that the Authority and Westlands were entitled to summary judgment on their claim against the federal defendants that Reclamation's provisional adoption and Reclamation's implementation of the 2009 BiOp and its RPA without preparing any NEPA

1    documentation violated NEPA.  *Consol. Salmonid Cases*, 688 F. Supp. 2d at 1035.

2    56.   This Court entered judgment that remanded without vacatur Reclamation's

3    provisional acceptance of the 2009 BiOp and its RPA.  The district court ordered Reclamation to

4    comply with its obligations under NEPA.  Reclamation did not appeal that NEPA ruling.

5    **The National Environmental Policy Act Review Process on Remand**

6    57.   Reclamation spent more than three years preparing the EIS challenged in this case.

7    58.   On March 28, 2012, Reclamation published a Notice of Intent to Prepare an

8    Environmental Impact Statement and Notice of Scoping Meetings for the remanded 2008 BiOp

9    and 2009 BiOp ("Notice of Intent").  77 Fed. Reg. 18858 (Mar. 28, 2012).  The Notice of Intent

10   stated that the "Bureau of Reclamation intends to prepare an environmental impact statement for

11   modifications to the continued long-term operation of the Central Valley Project, in a coordinated

12   manner with the State Water Project, that are likely to avoid jeopardy and destruction or adverse

13   modification of the designated critical habitat."  *Id.*

14   59.   On June 28, 2012, the Authority and Westlands submitted an extensive joint

15   comment letter in response to the Notice of Intent, which explained to Reclamation how it should

16   proceed with its NEPA review.  A copy of the Authority and Westlands June 28, 2012 joint

17   comment letter is attached hereto as Exhibit 1.

18   60.   Reclamation released two administrative draft versions of the EIS for review and

19   comment by some stakeholders, including the Authority and Westlands.  The Authority and

20   Westlands submitted joint comment letters on those administrative drafts of the EIS, on May 3,

21   2013, and July 14, 2015, respectively.  The May 3, 2013 comment letter is attached hereto as

22   Exhibit 2.  The July 14, 2015 comment letter is attached hereto as Exhibit 3.

23   61.   In their May 3, 2013 comment letter, the Authority and Westlands identified

24   numerous errors and inadequacies with the administrative draft EIS.  Among other defects, the

25   comment letter provided that it was an error for the "no action alternative" to include

26   implementation of the 2008 BiOp and 2009 BiOp.

27   62.   The draft EIS was released for public review in July 2015.

28   63.   On September 29, 2015, the Authority and Westlands submitted a detailed joint

1   comment letter that explained Reclamation's fundamental approach and analyses in the draft EIS

2   were flawed on numerous grounds.  In addition to the flawed "no action alternative" and other

3   errors, the comment letter explained that the draft EIS was inadequate because: (1) it failed to

4   identify any mitigation for lost CVP and SWP water supplies; (2) it unreasonably assumed that

5   increased use of groundwater will entirely substitute for lost CVP and SWP water supplies; (3) its

6   analyses of impacts to agricultural resources, socioeconomic impacts and environmental justice

7   impacts, among others, underestimated impacts due to the EIS's unreasonable assumptions about

8   groundwater use; and (4) it failed to analyze a reasonable range of alternatives that met the

9   purpose and need for the action.  A copy of the September 29, 2015 comment letter is attached

10  hereto as Exhibit 4.

11          64.     Reclamation released the final EIS on November 23, 2015.  Reclamation made

12  some revisions in the final EIS but Reclamation did not change its overall approach or analyses as

13  to major NEPA issues, such as the "no action alternative," potential mitigation measures, or

14  potential action alternatives.

15          65.     On January 11, 2016, Reclamation issued its Record of Decision for the

16  Coordinated Long-Term Operation of the Central Valley Project and State Water Project.  The

17  Record of Decision states that it "constitutes the Record of Decision (ROD) of the U.S.

18  Department of the Interior, Bureau of Reclamation (Reclamation) of the Coordinated Long-term

19  Operation of the Central Valley Project and State Water Project (LTO)."  Record of Decision, at 1.

20  The Record of Decision also states that the "decision made herein is based on information

21  presented in the Draft EIS (issued July 31, 2015) and the Final EIS, which are incorporated by

22  reference."  *Id*.  A copy of the Record of Decision is attached hereto as Exhibit 5.

23  **VI.     CLAIMS FOR RELIEF**
    **(ALL CLAIMS FOR RELIEF ARE ASSERTED AGAINST ALL DEFENDANTS)**

24

            **FIRST CLAIM FOR RELIEF**

25

26  **(For Violation of the National Environmental Policy Act – Failure to Identify the Proposed
    Action)**

27          66.     Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs

28  1 through 65, inclusive, of this Complaint and further allege:

67.     Reclamation is a federal agency subject to NEPA.

68.     NEPA requires all federal agencies to prepare an EIS to evaluate the potential environmental consequences of any proposed "major Federal action [ ] significantly affecting the quality of the human environment."  42 U.S.C. 4332(C).

69.     "Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined."  40 C.F.R. § 1502.4(a).

70.     Interior's regulations for implementation of NEPA mandate that an EIS include a "description of the proposed action."  43 C.F.R. § 46.415(a)(2).

71.     Interior's regulations define the "proposed action" as "the bureau activity under consideration" and the regulations state that the "proposed action" must be "clearly described in order to proceed with NEPA analysis."  43 C.F.R. § 46.30.

72.     The EIS does not clearly identify the "proposed action" that is being analyzed for purposes of NEPA.

73.     The EIS states: "The EIS evaluates potential long-term direct, indirect, and cumulative impacts on the environment that could result from implementation of modifications to the continued long-term operation of the CVP and SWP."  EIS at 1-1.

74.     Reclamation's failure to clearly identify or describe the "proposed action" in the EIS results in an inadequate environmental impact statement.

75.     Reclamation's failure to clearly identify or describe the "proposed action" in the EIS is (1) arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; and (2) without observance of procedure required by law, within the meaning of 5 U.S.C. § 706(2)(A) and (D).

76.     A judicial declaration is necessary and appropriate at this time under all the circumstances in order that Plaintiffs may ascertain their rights and Reclamation's obligations pursuant to NEPA.

77.     Plaintiffs have no plain, speedy or adequate remedy in the course of law.  Plaintiffs therefore seek declaratory relief against Defendants as set forth below.

78.     WHEREFORE, Plaintiffs pray for relief as more fully set forth below.

## SECOND CLAIM FOR RELIEF

### (For Violation of the National Environmental Policy Act – No Action Alternative Is Arbitrary, Capricious and Contrary to Law )

79.     Plaintiffs reallege and incorporate herein, as if set forth in full, each and every allegation contained in paragraphs 1 through 78, inclusive, of this Complaint and further allege:

80.     An EIS must "[i]nclude the alternative of no action."  40 C.F.R. § 1502.14(d).

81.     In an EIS, the action alternatives are compared to the no action alternative to measure the impacts of each action alternative.

82.     According to Reclamation's NEPA Handbook, "'[n]o action' represents a projection of current conditions and reasonably foreseeable actions to the most reasonable future responses or conditions that could occur during the life of the project without any action alternatives being implemented."  Reclamation's NEPA Handbook (Feb. 2012) at 8-8.

83.     The no action alternative represents "the future without the project."  Reclamation's NEPA Handbook (Feb. 2012) at 8-8.

84.     The EIS's No Action Alternative does not allow the decision-makers or the public to evaluate and compare the environmental consequences of implementing the BiOps and RPAs because it includes the RPAs.

85.     The EIS states that "[b]ecause the RPAs were provisionally accepted and the No Action Alternative represents a continuation of existing policy and management direction, the No Action Alternative includes the RPAs."  EIS at ES-9.

86.     The No Action Alternative is unlawful because it fails to account for the fact that Reclamation was required, but failed, to conduct NEPA review *before* accepting and implementing the BiOps and their RPAs.

87.     This Court previously ruled that Reclamation violated NEPA by significantly modifying CVP operations by accepting and implementing the prescriptions of the BiOps without first performing NEPA analysis of the impacts of such prescriptions.

88.     To remedy the NEPA error found by this Court and satisfy its duties under NEPA, Reclamation must place itself back in the position it was in before that error occurred (i.e. before

14

COMPLAINT FOR VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT

1   provisionally adopting the BiOps without performing any NEPA analysis).

2       89.    The "no action" alternative should be defined to include operations consistent with

3   Reclamation's and DWR's obligations and all legal requirements except any ESA-related

4   requirements that involve major changes to CVP and SWP operations.

5       90.    "A no action alternative in an EIS is meaningless if it assumes the existence of the

6   very plan being proposed." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th

7   Cir. 2008).

8       91.    The EIS's No Action Alternative defeats the purpose of the no action alternative—

9   to provide a meaningful comparative scenario with which to gauge the impacts of the action

10  alternatives.

11      92.    The EIS's "Second Basis of Comparison" is not an adequate substitute for the "no

12  action alternative" required under NEPA.

13      93.    The EIS states that it includes a "Second Basis of Comparison" that "represents a

14  condition in 2030 without implementation of the 2008 USFWS BO and 2009 NMFS BO.  All of

15  the alternatives are compared to the No Action Alternative and to the Second Basis of Comparison

16  to describe the effects that could occur in 2030 under both bases of comparison."  EIS at ES-9.

17      94.    Reclamation did not satisfy it NEPA obligation to include an appropriate "no action

18  alternative" by providing the "Second Basis of Comparison" in the EIS.

19      95.    The EIS disregards the "Second Basis of Comparison" throughout much of its

20  NEPA analysis.  Critically, the EIS fails to identify mitigation measures that could mitigate the

21  impacts associated with implementing the BiOps and their RPAs.

22      96.    The EIS's unlawful No Action Alternative results in an EIS that fails to consider or

23  evaluate possible mitigation measures for effects on CVP and SWP water supplies, as alleged

24  more fully below.

25      97.    The EIS's No Action Alternative is:   (1) arbitrary, capricious, an abuse of

26  discretion, and otherwise not in accordance with law; and (2) without observance of procedure

27  required by law, within the meaning of 5 U.S.C. § 706(2)(A) and (D).

28      98.    A judicial declaration is necessary and appropriate at this time under all the

circumstances in order that Plaintiffs may ascertain their rights and Reclamation's obligations pursuant to NEPA.

99.     Plaintiffs have no plain, speedy or adequate remedy in the course of law.  Plaintiffs therefore seek declaratory relief against Defendants as set forth below.

100.     WHEREFORE, Plaintiffs pray for relief as more fully set forth below.

## THIRD CLAIM FOR RELIEF

**(For Violation of the National Environmental Policy Act – Failure to Identify and Analyze Possible Mitigation Measures for Impacts to CVP and SWP Water Supplies)**

101.     Plaintiffs reallege and incorporate herein, as if set forth in full, each and every allegation contained in paragraphs 1 through 100, inclusive, of this Complaint and further allege:

102.     In addition to analyzing the impacts of all potential, feasible alternatives, the EIS must include a discussion of the "means to mitigate adverse environmental impacts."  40 C.F.R. § 1502.16(h).

103.     The EIS must identify all relevant, reasonable mitigation measures that could alleviate a project's environmental effects, even if they entail actions that are outside the lead or cooperating agencies' jurisdiction.

104.     Mitigation measures must entail feasible, specific actions that could avoid impacts by eliminating certain actions; minimizing impacts by limiting their degree; rectifying impacts by repairing, rehabilitating or restoring the affected environment; reducing impacts through preservation or maintenance; and/or compensating for a project's impacts by replacing or providing substitute resources.  40 C.F.R. § 1508.20.

105.     The EIS fails to identify or examine mitigation measures that may help mitigate the impacts of implementing the BiOps and the RPAs.  The EIS fails to provide this critical component of the analysis required by NEPA.

106.     The EIS states that "Mitigation measures were not included to address adverse impacts under the alternatives as compared to the Second Basis of Comparison because this analysis was included in this EIS for information purposes only."  EIS at ES-17.

107.     The EIS shows that continued implementation of the BiOps will cause significant

reductions in CVP and SWP water deliveries, but the EIS makes no effort to identify possible ways to mitigate those water supply impacts. EIS at 5-100 – 5-105 (tables showing reduced water deliveries and text describing reductions).

108.    The EIS estimates that on a long-term annual average, the BiOps will reduce CVP water deliveries by 335,000 acre-feet annually, and reduce SWP water deliveries by 773,000 acre-feet annually. EIS at 5-100 – 5-105.

109.    The EIS estimates that implementation of the BiOps is expected to reduce deliveries to CVP South of Delta agricultural water service contractors "by 23 percent over the long-term conditions, 32 percent in dry years, and 33 percent in critical dry years." EIS at 5-102.

110.    The EIS estimates that implementation of the BiOps is expected to reduce deliveries to CVP South of Delta municipal and industrial contractors "by 10 percent over the long-term conditions, 9 percent in dry years, and 5 percent in critical dry years." EIS at 5-102.

111.    The EIS estimates that implementation of the BiOps is expected to reduce CVP wildlife refuge Level 2 water deliveries over long-term conditions by 5 percent North of Delta. EIS at 5-100.

112.    The EIS estimates that implementation of the BiOps is expected to reduce deliveries of Article 21 water to SWP South of Delta water contractors "by 83 percent over the long-term conditions; 96 percent in dry years; and 92 percent in critical dry years." EIS at 5-105.

113.    The impacts of reduced CVP and SWP water supplies have already been realized in the years since the BiOps were accepted and implemented. Agricultural contractors have experienced land fallowing, groundwater overdraft and reduced groundwater quality, and socioeconomic impacts within agricultural communities. Municipal water suppliers have suffered reductions in high quality CVP and SWP water deliveries, and have had to rely on groundwater reserves, voluntary or mandatory conservation efforts, and alternative water sources to try to meet municipal water demands, including basic health and safety needs. Wildlife refuges dependent on CVP water supplies have experienced adverse effects on local birds and wildlife. Reduced CVP deliveries to wildlife refuges causes diminished water quality and habitat, depleted food resources within the refuges, and declines in the observed body conditions of migratory birds.

114.    The EIS fails to identify even a single mitigation measure that could help mitigate the water supply impacts to CVP and SWP water service contractors resulting from implementation of the BiOps.

115.    The EIS fails to identify mitigation for those impacts disclosed in the EIS and also fails to identify mitigation for impacts that are underestimated or undisclosed in the EIS.

116.    Even if the EIS did identify mitigation for the modeled water supply impacts resulting from implementation of the BiOps, that mitigation would likely be insufficient to mitigate the extent of the water supply impacts, based on the actual impacts to CVP and SWP contractors caused by the BiOps.

117.    Failing to identify or evaluate mitigation for the massive losses of water supply that will indisputably result from implementing the BiOps is a violation of NEPA.

118.    Reclamation's failure to consider or analyze possible mitigation measures in the EIS, including possible mitigation measures for the adverse environmental impacts on CVP and SWP water deliveries, is (1) arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; and (2) without observance of procedure required by law, within the meaning of 5 U.S.C. § 706(2)(A) and (D).

119.    A judicial declaration is necessary and appropriate at this time under all the circumstances in order that Plaintiffs may ascertain their rights and Reclamation's obligations pursuant to NEPA.

120.    Plaintiffs have no plain, speedy or adequate remedy in the course of law.  Plaintiffs therefore seek declaratory relief against Defendants as set forth below.

121.    WHEREFORE, Plaintiffs pray for relief as more fully set forth below.

## FOURTH CLAIM FOR RELIEF

**(For Violation of the National Environmental Policy Act – Analyses of Environmental Effects Are Inadequate Due to Arbitrary, Capricious, and Unreasonable Assumptions Regarding Water Supplies)**

122.    Plaintiffs reallege and incorporate herein, as if set forth in full, each and every allegation contained in paragraphs 1 through 121, inclusive, of this Complaint and further allege:

123.    The EIS makes several unreasonable and unsupported assumptions regarding water

supplies that skew the environmental effects analyses and cause environmental impacts to be left unexamined and underestimated.

**Unreasonable Assumptions Regarding Water Deliveries To Wildlife Refuges, Exchange Contractors, and Municipal and Industrial Contractors**

124.    Despite the reductions in CVP water deliveries to wildlife refuges and San Joaquin River Exchange Contractors ("Exchange Contractors") already experienced under the BiOps, the EIS unreasonably assumes that the BiOps will not result in any reductions in CVP water deliveries to south of Delta wildlife refuges or the Exchange Contractors.  EIS, at 5-101.  These conclusions are unsupported and contrary to actual experience.

125.    Many wildlife refuges rely almost exclusively on CVP water and wildlife refuges experienced deteriorated habitat conditions in 2014 and 2015 due to reductions in CVP deliveries. The Exchange Contractors also suffered CVP shortages in 2014 and 2015.

126.    Because the EIS unreasonably assumes that there will be no reductions in CVP water deliveries to south of Delta wildlife refuges, the EIS fails to analyze or disclose the environmental impacts of such reduced water deliveries.  The EIS fails to analyze or disclose the potential environmental impacts to wildlife that are dependent on wildlife refuges.  The EIS fails to identify potential mitigation measures to mitigate the water supply impacts and biological impacts to wildlife refuges.

127.    Because the EIS unreasonably assumes that there will be no reductions in CVP water deliveries to the Exchange Contractors, the EIS fails to analyze or disclose the environmental impacts of such reduced water deliveries.  The EIS fails to analyze or disclose the potential environmental impacts within the service areas of the Exchange Contractors.  The EIS fails to identify potential mitigation measures to mitigate the water supply impacts and resulting additional environmental impacts to the Exchange Contractors.

128.    In addition, the EIS underestimates water supply impacts, and resulting environmental impacts, to municipal and industrial contractors due to implementation of the BiOps.

129.    The EIS estimates that implementation of the BiOps is expected to reduce

1   deliveries to CVP south of Delta municipal and industrial contractors "by 10 percent over the

2   long-term conditions, 9 percent in dry years, and 5 percent in critical dry years."  EIS at 5-102.

3       130.   The EIS estimate for reductions in water deliveries to CVP south of Delta

4   municipal and industrial contractors is unreasonable because it is inconsistent with actual,

5   experienced reductions in CVP water deliveries under the prescriptions of the BiOps.

6       131.   The EIS fails to adequately analyze the cascading environmental impacts that can

7   result from reductions in water deliveries to municipal and industrial contractors, such as

8   reductions in water quality, increased demand on groundwater supplies and resulting overdraft and

9   land subsidence, and increased demand on water reserves and other alternative water supplies.

10  **Unreasonable Assumptions Regarding Future Water Supplies and Groundwater Use**

11      132.   The EIS unreasonably assumes that future water demands will be met in dry and

12  critical dry years.

13      133.   The EIS states that: "Under the No Action Alternative and Second Basis of

14  Comparison, it is assumed that water demands would be met on a long-term basis and in dry and

15  critical dry years using a combination of conservation, CVP and SWP water supplies, other

16  imported water supplies, groundwater, recycled water, infrastructure improvements, desalination

17  water treatment, and water transfers and exchanges."  EIS at 5-72.

18      134.   The EIS's assumption that future water demands will be met in all water year types

19  is unreasonable and unsupported because it is grounded in several other unreasonable

20  assumptions, particularly regarding the availability of groundwater.

21      135.   The EIS ignores the impacts that have actually occurred since the BiOps were

22  adopted, particularly in 2014 and 2015.  Recent years demonstrate that groundwater supplies do

23  not and will not provide an adequate substitute for reduced CVP and SWP water deliveries.  Many

24  wildlife refuges rely almost exclusively on CVP water and wildlife refuges experienced

25  deteriorated habitat conditions in 2014 and 2015 due to reductions in CVP deliveries.  CVP

26  municipal and industrial contractors, Sacramento settlement contractors, and Exchange

27  Contractors also suffered shortages in 2014 and 2015.  Finally, past years confirm that reduced

28  CVP and SWP water deliveries to agricultural contractors result in reduced agricultural production

COMPLAINT FOR VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT

and land fallowing.

136.    The EIS also unreasonably assumes that groundwater use can be increased from current levels, despite recent California legislation that will significantly regulate groundwater use.

137.    The EIS assumes an "increase in groundwater pumping of approximately 6 percent" in Sacramento Valley and San Joaquin Valley.  EIS at 19-47.

138.    The EIS unreasonably assumes that groundwater use will increase in the future, even in groundwater basins with existing overdraft conditions.

139.    The EIS states: "The No Action Alternative and the Second Basis of Comparison assume that groundwater would continue to be used even if groundwater overdraft conditions continue or become worse."  EIS at 5-74.

140.    The EIS unreasonably assumes the new California Sustainable Groundwater Management Act ("SGMA") will not affect groundwater use between now and the year 2030, which is the year selected for the environmental analyses in the EIS.

141.    The EIS states that it "is recognized that in September 2014 the Sustainable Groundwater Management Act (SGMA) was enacted.  The SGMA provides for the establishment of a Groundwater Sustainability Agencies (GSAs) to prepare Groundwater Sustainability Plans (GSPs) that will include best management practices for sustainable groundwater management." EIS at 5-74.

142.    The EIS further states: "The SGMA requires the formation of GSPs in groundwater basins or subbasins that DWR designates as medium or high priority based upon groundwater conditions identified using the CAGESM results by 2022. Sustainable groundwater operations must be achieved within 20 years following completion of the GSPs. In some areas with adjudicated groundwater basins, sustainable groundwater management could be achieved and/or maintained by 2030. However, to achieve sustainable conditions in many areas, measures could require several years to design and construct water supply facilities to replace groundwater, such as seawater desalination. Therefore, it does not appear to be reasonable and foreseeable that sustainable groundwater management would be achieved by 2030; and it is assumed that groundwater pumping will continue to be used to meet water demands not fulfilled with surface

1   water supplies or other alternative water supplies in 2030." EIS at 5-74.

2       143.   The assumption that groundwater use will increase in 2030, despite SGMA, is

3   unreasonable and unsupported.

4       144.   SGMA requires that groundwater basins in critical overdraft begin being managed

5   under groundwater sustainability plans starting in 2020.  Cal. Wat. Code § 10720.7(a)(1).  The

6   EIS's presumption that groundwater availability will not be affected in 2030, after ten years of

7   implementing a sustainability plan for a basin in critical overdraft, is unreasonable.

8       145.   The EIS admits that "Eight subbasins in the San Joaquin Valley Groundwater Basin

9   were identified in a state of critical overdraft: Chowchilla, Eastern San Joaquin, Madera, Kings,

10  Kaweah, Tule, Tulare Lake, and Kern (DWR 1980)." EIS at 7-28.

11      146.   The EIS fails to explain how it is reasonable to assume that groundwater use will

12  increase in basins that are already in critical overdraft, and which will need to be managed for

13  sustainability starting in 2020.  Cal. Wat. Code § 10720.7(a)(1).

14      147.   The EIS fails to acknowledge or consider that SGMA requires annual reporting

15  regarding water use to DWR and also requires DWR to assess each basin's progress in achieving

16  sustainability, at least every five years after a sustainability plan is submitted.  Cal. Wat. Code §

17  10733.8.  The EIS's assumption that the status quo for groundwater use will be maintained up to

18  and including 2030 is unreasonable, because managing agencies will be required to demonstrate

19  progress towards sustainability (e.g. using less groundwater) by 2025 or 2027.

20      148.   Further, the EIS fails to recognize or consider that in some cases sustainability may

21  be achieved through reductions in water demands (e.g. fallowing of agricultural lands), and that

22  these reductions do not require new "water supply facilities" to be in place before reductions in

23  groundwater use are mandated.

24      149.   The EIS's assumption that groundwater will provide a complete substitute for

25  reductions in surface water supplies is contrary to actual observed conditions.  In recent years the

26  lack of surface water supply has resulted significant land fallowing, something that would not

27  occur if groundwater could simply be substituted for lost surface water supplies.

28      150.   DWR recently reported that: "[a]lthough groundwater and water transfers may

22

1    make up for some of the lost surface water supplies, cuts of this magnitude [like those of 2014 and

2    2015] result in abandonment of permanent plantings such as orchards and vineyards, large-scale

3    land fallowing, and job losses in rural communities dependent on agricultural employment."

4    DWR, 2015 Drought Brochure at 11.

5        151.    The EIS's assumption that groundwater use will increase in the future and provide

6    a complete substitute supply for reductions in CVP and SWP water supplies is unreasonable in

7    light of new regulation of groundwater use and observed conditions in past years of reduced CVP

8    and SWP water deliveries.

9    **Analyses of Environmental Consequences Inadequate Due to Unreasonable Assumptions**

10       152.    The EIS's unreasonable assumption regarding future groundwater supplies

11   permeates the analyses of environmental effects and causes environmental effects in multiple

12   resource categories to be understated.  As a result, the EIS fails to fully disclose the environmental

13   consequences of implementing the BiOps and RPAs.

14                              Impacts To Agricultural Resources

15       153.    The EIS's analyses of environmental impacts on agricultural resources is

16   inadequate and fails to disclose the agricultural impacts of implementing the BiOps.

17       154.    The EIS unreasonably concludes that "Agricultural production in the Sacramento

18   Valley would be similar (less than 5 percent change) under the No Action Alternative and the

19   Second Basis of Comparison over long term average conditions and in dry and critical dry years

20   due to increased use of groundwater...."  EIS at 12-28.  The EIS reaches the same unreasonable

21   conclusion with respect to agricultural production in the San Joaquin Valley.  EIS at 12-30.

22       155.    The EIS's analyses of impacts to agricultural resources unreasonably assumes that

23   there are no limits on the amount of groundwater available to support agriculture.  The EIS states

24   that the "analysis does not restrict groundwater withdrawals based upon groundwater overdraft or

25   groundwater quality conditions."  EIS at 12-24.

26       156.    The EIS's conclusions regarding no significant impacts to agricultural production

27   are also contradicted by substantial evidence indicating that lands are, and will be, fallowed in

28   response to reductions in surface water supplies from the CVP and SWP.

1    157.    The EIS itself acknowledges that "[i]n extreme dry periods, such as 2014 when

2    there were no deliveries of CVP water to San Joaquin Valley water supply agencies with CVP

3    water service contracts, permanent crops were removed because the plants would not survive the

4    stress of no water or saline groundwater (Fresno Bee 2014)."  EIS at 12-10.  The EIS fails to apply

5    these observed facts to its analysis of how agricultural resources will be impacted by reduced CVP

6    and SWP deliveries in the future.

7    158.    The EIS fails to adequately analyze or disclose the impacts to agriculture that result

8    from reduced CVP and SWP water supplies, such as those that result from implementation of the

9    BiOps.

10                                        Socioeconomic Impacts

11    159.    The EIS's analyses of socioeconomic impacts is inadequate and fails to disclose the

12    socioeconomic impacts on agriculture-dependent communities from implementing the BiOps.

13    160.    The EIS's unreasonable assumption about groundwater use, and resulting

14    conclusions regarding effects on agriculture, skew the analysis of socioeconomic impacts.

15    161.    The EIS's assessment of socioeconomic impacts to agriculture-dependent

16    communities in the Central Valley region is grounded in the faulty assumption that "the impact to

17    irrigated acreage and agricultural production is relatively small" and that "[m]ost of the change in

18    CVP or SWP irrigation supplies would be offset by changes in groundwater pumping, with only

19    small changes in crop acreage in production."  EIS at 19-37.

20    162.    The EIS's estimates of socioeconomic impacts associated with reduced agricultural

21    production are gross underestimates.

22    163.    There are cascading socioeconomic impacts that result from decreased agriculture

23    productivity.

24    164.    The EIS significantly underestimates the losses in agricultural-related jobs that

25    result from reduced CVP and SWP water supplies.

26                                        Environmental Justice Impacts

27    165.    The EIS fails to analyze or disclose the environmental justice impacts from

28    implementing the BiOps on agriculture-dependent communities that have high levels of poverty

1    and minority populations.

2         166.    Due to the EIS's unreasonable assumptions about groundwater use and in turn,

3    about impacts to agriculture and agriculture-dependent communities, the EIS provides no analysis

4    of the environmental justice impacts that result from reduced CVP and SWP water supplies.

5         167.    The EIS acknowledges that many of the areas that would be impacted by reduced

6    water deliveries from the CVP and SWP, such as the San Joaquin Valley, are areas with higher

7    concentrations of minority populations and/or populations below the poverty level.

8         168.    The EIS recognizes that portions of the San Joaquin Valley are considered "poverty

9    areas": "Merced, Fresno, Tulare, and Kern counties are defined as poverty areas because more

10   than 20 percent of the populations in these counties are below the poverty level."  EIS at 21-16.

11   Also, "[t]here are communities within these counties that have higher concentrations of minority

12   populations and/or populations below the poverty level. These communities are mainly farming

13   communities that have been impacted by loss in agricultural employment . . .."  *Id.*

14        169.    But the EIS contains no analysis of the environmental justice impacts to

15   agricultural communities that rely on CVP and SWP water supplies, which result from reduced

16   CVP and SWP water deliveries.

17        170.    The EIS's conclusions that there will not be significant changes in agricultural

18   employment, and in turn, that there are no potential significant environmental justice impacts to

19   disadvantaged agricultural communities, is grounded in the unreasonable assumption that

20   groundwater will provide a complete substitute for reductions in CVP and SWP water supplies.

21        171.    The EIS's assumption that groundwater can provide a substitute for reduced CVP

22   and SWP water supplies is contrary to observed conditions in the San Joaquin Valley in the past

23   few years with implementation of the BiOps.

24        172.    Conditions during the recent drought exemplify the types of impacts that occur in

25   these disadvantaged communities, due to reductions in water supplies and the resulting land

26   fallowing.

27        173.    As the EIS describes: "increased levels of land fallowing on irrigated cropland in

28   the San Joaquin Valley has resulted in significant economic losses in small farming communities.

1  Higher than typical unemployment rates has resulted in increased food insecurity." EIS at 21-20.

2        174.    The EIS recognizes that agriculture-dependent communities, such as Huron and

3  Mendota, have experienced increased unemployment and increased reliance on social services "at

4  a time when both agricultural cultivated acreage and farm employment in the area declined; and

5  included five consecutive years with reduced water availability . . .." EIS at 21-22.

6        175.    The observed relationship between reduced surface water supplies and reduced

7  agricultural productivity and farm employment shows that the reductions in CVP and SWP water

8  supplies due to implementation of the BiOps will negatively impact these agriculture-dependent

9  communities.

10        176.    Reduced CVP and SWP water supplies have, and will continue to have, significant

11  environmental justice impacts on the agricultural communities throughout the Central Valley.

12        177.    Reclamation's unreasonable assumptions about the availability and use of water

13  supplies and groundwater use, and Reclamation's inadequate analyses of impacts to wildlife

14  refuges, Exchange Contractors, agricultural resources, and socioeconomic and environmental

15  justice impacts in agriculture-dependent communities, results in an EIS that is (1) arbitrary,

16  capricious, an abuse of discretion, and otherwise not in accordance with law; and (2) without

17  observance of procedure required by law, within the meaning of 5 U.S.C. § 706(2)(A) and (D).

18        178.    A judicial declaration is necessary and appropriate at this time under all the

19  circumstances in order that Plaintiffs may ascertain their rights and Reclamation's obligations

20  pursuant to NEPA.

21        179.    Plaintiffs have no plain, speedy or adequate remedy in the course of law. Plaintiffs

22  therefore seek declaratory relief against Defendants as set forth below.

23        180.    WHEREFORE, Plaintiffs pray for relief as more fully set forth below.

24                              **FIFTH CLAIM FOR RELIEF**

25     **(For Violation of the National Environmental Policy Act – Failure to Identify and Analyze
     Reasonable Range of Alternative Actions)**

26

27        181.    Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs

28  1 to 180.

182.  The alternatives section of an EIS "is the heart of the environmental impact statement."  40 C.F.R. § 1502.14.

183.  The alternatives presented and analyzed in the EIS are legally inadequate.  The EIS's alternatives do not represent a reasonable range of alternatives that are responsive to the identified purpose and need for the proposed action.

184.  An EIS must contain a statement of "purpose and need" which briefly specifies "the underlying purpose and need to which the [lead] agency is responding in proposing the alternatives including the proposed action."  40 C.F.R. § 1502.13.

185.  Here, the action is needed because of the difficulty the CVP and SWP have had in serving water supply and other project purposes while complying with the ESA.

186.  The purpose of the action is to continue long-term operation of both the CVP and SWP in a manner that will enable Reclamation and the DWR to satisfy their contractual and other legal obligations to the fullest extent possible.  The alternatives should have been developed to meet the authorized purposes of the CVP and SWP, including optimizing water deliveries to CVP and SWP contractors.

187.  To develop a reasonable range of alternatives that meets the purpose and need, Reclamation was required to, but failed to, analyze what changes to coordinated CVP operations, if any, are necessary to comply with the ESA.  Reclamation had an independent obligation under the ESA to determine what actions are necessary to avoid jeopardy to ESA-listed species.

188.  The EIS's five alternatives do not reflect the necessary inquiry into what modifications to coordinated CVP operations, if any, are necessary to satisfy Reclamation's obligations under the ESA.

189.  The EIS fails to explain whether or how each of its alternatives avoid the likelihood of jeopardizing listed species or their critical habitat.

190.  The NEPA implementing regulations require that Federal agencies, to the fullest extent possible, use the NEPA process "to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment."  40 C.F.R. § 1500.2(e).

191.   Reclamation's failure to take a "hard look" at what alternative actions could be taken that would meet its ESA obligations and also minimize or avoid impacts to the human environment associated with reduced CVP and SWP water supplies, has resulted in an inadequate range of alternatives in the EIS.

192.   An analysis of alternatives designed to avoid jeopardy to the relevant ESA-listed species is necessary for both the decision-makers and the public to evaluate and compare the alternative actions and inform the decision regarding what modifications, if any, to coordinated CVP operations, should be implemented.

193.   Mixing and tweaking elements of the RPAs of the existing BiOps, without ever fundamentally reconsidering the RPAs, does not suffice to meet Reclamation's NEPA obligations.

194.   Reclamation failed to develop or analyze alternatives that could allow for adequate water deliveries and prevent significant impacts to public health and the human environment, and also sufficiently maintain and protect the listed species and their critical habitats.

195.   Reclamation's failure to develop or analyze a reasonable range of alternatives that meets the purpose of the CVP and SWP and also addresses the need to comply with the ESA, results in an EIS that is (1) arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; and (2) without observance of procedure required by law, within the meaning of 5 U.S.C. § 706(2)(A) and (D).

196.   A judicial declaration is necessary and appropriate at this time under all the circumstances in order that Plaintiffs may ascertain their rights and Reclamation's obligations pursuant to NEPA.

197.   Plaintiffs have no plain, speedy or adequate remedy in the course of law.  Plaintiffs therefore seek declaratory relief against Defendants as set forth below.

198.   WHEREFORE, Plaintiffs pray for relief as more fully set forth below.

VII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.   For an order setting aside Reclamation's decision documented in the Record of Decision and declaring it unlawful because it was adopted without compliance with NEPA;

1    2.    For an order declaring that the EIS is legally inadequate;

2    3.    For an order remanding Reclamation's decision with direction to prepare an

3 adequate NEPA analysis before making a new decision regarding how to operate the CVP to best

4 serve all its purposes while still meeting its obligations to comply with the ESA;

5    4.    For costs of suit, including reasonable attorneys' fees; and

6    5.    For such other and further relief as the Court may deem just and proper.

7

8 Dated:  July 8, 2016                          KRONICK, MOSKOVITZ, TIEDEMANN & GIRARD
                                               A Professional Corporation
9

10

11                                             By:        /s/ Daniel J. O'Hanlon
                                                   _____
12                                                 Daniel J. O'Hanlon
                                                   Attorneys for Plaintiffs, SAN LUIS & DELTA-
13                                                 MENDOTA WATER AUTHORITY and
                                                   WESTLANDS WATER DISTRICT
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT